# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Mark Filip | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 327 | **DATE** | 12/17/2004 |
| **CASE TITLE** | JOSEPH N. HICKS vs. MICHAEL SHEAHAN, et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Defendant's motion for summary judgment is granted with respect to Counts III and V, and is denied with respect to Counts I, II, and IV. STATUS HEARING SET FOR 1/6/05 at 9:30a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | DEC 20 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 54 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| TBK | courtroom deputy's initials | | | mailing deputy initials |

Date/time received in central Clerk's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSEPH N. HICKS,            )
                           )
            Plaintiff,      )
                           )
      v.                    )      No. 03 C 0327
                           )
                           )      Judge Mark Filip
MICHAEL SHEAHAN, in his Official    )
Capacity, as Sheriff of COOK COUNTY )
DEPARTMENT OF CORRECTIONS,   )
and COUNTY OF COOK, ILLINOIS,  )
d/b/a COOK COUNTY DEPARTMENT  )
OF CORRECTIONS,              )
                           )
            Defendants.     )

**MEMORANDUM OPINION AND ORDER**

Plaintiff Joseph N. Hicks ("Plaintiff" or "Hicks") filed a second amended complaint on

April 21, 2004, alleging that he was discriminated against in violation of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and 42 U.S.C. § 1983 by Defendant Michael

Sheahan, in his official capacity as Sheriff of Cook County and head of the Department of

Corrections ("Defendant" or "DOC"). Hicks alleges that Defendant subjected him to a sexually

hostile work environment, discriminated against him on the basis of his sex, violated his right to

equal protection under the law, and retaliated against him for pursuing his claims. Defendant

moves for summary judgment on all counts ("Motion"). (D.E. 37.) For the reasons explained

below, Defendant's motion is granted in part and denied in part.

BACKGROUND

I.      Local Rule 56.1

Before reciting the factual background of this case, the Court finds it necessary to

comment upon the parties' attempts to comply with Local Rule 56.1 ("L.R. 56.1"). L.R. 56.1 requires that statements of facts contain allegations of material fact, and the factual allegations must be supported by admissible record evidence. *See* L.R. 56.1; *Malec v. Sanford*, 191 F.R.D. 581, 583-85 (N.D. Ill. 2000). The Seventh Circuit teaches that a district court has broad discretion to require strict compliance with L.R. 56.1. *See, e.g., Koszola v. Bd. of Ed. of City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon*, 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995) (collecting cases)).

Each of the parties has made several errors in violation of L.R. 56.1. For example, Hicks objects to many of DOC's individual statements of fact because the paragraphs are neither short nor concise. *See* L.R. 56.1(a) ("The statement [of material facts] shall consist of short numbered paragraphs. . . ."). The Court notes that while Hicks may be correct in his objection to Defendant's statements (*see, e.g.*, Statement of Uncontested Facts In Support of Defendant's Motion for Summary Judgment ("Def. SF") ¶ 10 (D.E. 38); Plaintiff's Response to Defendant's Rule 56.1(a)(3) Statement ("Pl. Resp.") ¶ 10 (D.E. 44) (objecting)), Hicks has committed the same violation (*see, e.g.*, Plaintiff's Affirmative Local Rule 56.1(b)(3)(B) Statement of Material Facts As To Which There Is No Genuine Dispute ("Pl. SAF") ¶ 7 (D.E. 48); Defendant's Reply to Plaintiff's Response to Statement of Uncontested Facts In Support of Defendant's Motion for Summary Judgment ("Def. Resp.") ¶ 7 (D.E. 51) (objecting)). Thus, the Court will simply admonish both parties to please conform their pleadings to the rule in the future, and the Court will do its best to work with what it has been given.

Defendant has also failed to provide the Court with a narrative of facts in its

Memorandum of Law supporting its Motion. (*See* D.E. 37, Mem. of Law at 1). Instead, Defendant merely incorporates and directs the Court to its lengthy statement of facts. This, too, is improper. *See Malec*, 191 F.R.D. at 585 ("[L.R.] 56.1 statements do not abrogate a party's obligation to recite its version of the facts in its supporting memorandum; it is inappropriate in one's memo to simply refer the Court to the 56.1 statement."). Generally, the lack of such statement is not merely an inconvenience for the Court (in that Defendant has not laid out a concise, chronological statement of the pertinent facts); it also disadvantages the Plaintiff (in that Defendant is effectively given more space for its legal arguments). Since, however, Hicks has not objected to the Motion on this ground—and the Court granted Hicks's motion to file a short surreply (*see* D.E. 53)—the Court finds that this violation of L.R. 56.1 does not justify denial of the Motion in its entirety.

More substantively, the Court notes that Defendant improperly filed a Reply to Plaintiff's Response to Statement of Uncontested Facts. (*See* D.E. 51.) While Defendant is permitted to file a response to Hicks's statement of additional facts, *see* L.R. 56.1(a), nowhere does the rule state that a movant may reply to the responses of the non-movant. Thus, while the Court will consider the latter half of Defendant's Reply, which responds to Hicks's additional statements of fact, the Court will not consider the unnecessary and improper "replies" to Plaintiff's responses. *See Schulz v. Varian Medical Systems, Inc.*, 315 F. Supp. 2d 923, 925 n.1 (N.D. Ill. 2004); *accord Kozlowski v. Fry*, 238 F. Supp. 2d 996, 1000 n.2 (N.D. Ill. 2002) (Keys, M.J.) (citing *White v. Sundstrand Corp.*, No. 98 C 50070, 2000 WL 713739, at *2 (N.D. Ill. May 23, 2000) (Reinhard, J.), *aff'd*, 256 F.3d 580 (7th Cir. 2001)). The Court does note, however, Defendant's request in its reply for certain portions of Hicks's responses to be stricken. (*See generally* D.E.

3

51 at 1-2.) Rather than rule on the individual paragraphs identified by Defendant, the Court will draw only from the portions of the responses that are appropriate (*i.e.*, those statements explaining the denials), *see Malec*, 191 F.R.D. at 584 ("If the cited material does not clearly create a genuine dispute over the movant's allegedly undisputed fact, the nonmovant should provide an explanation."), and it will ignore any improper additional statements of fact. *See id.* (stating that L.R. 56.1(b)(3)(B) statement is the only acceptable means of presenting additional facts to the Court).

Perhaps most importantly, the Court directs the parties to L.R. 56.1's provision that deems admitted for purposes of summary judgment any statement of fact not controverted by the statement of the opposing party. *See* L.R. 56.1(a), (b)(3)(B). The Court notes that both parties have improperly denied a number of factual assertions by failing to provide adequate record support—sometimes failing to provide *any* record support—for their denials. Thus, where those factual assertions are properly supported by the record, the Court deems them admitted. *See Malec*, 191 F.R.D. at 584 ("[A] general denial is insufficient to rebut a movant's factual allegations."); *id.* (failure to adhere to L.R. 56.1 requirements, including citation to specific evidentiary materials justifying denial, is equivalent to admission). The Court will note such deemed admissions throughout its recitation of the relevant facts, below.

II.     Facts

   A.     *The Parties and the Relationship Between DOC and Aramark*

Joseph Hicks has been employed as a correctional officer by DOC since 1993. (Def. SF ¶ 2.) He began working in the Central Kitchen of the Cook County Jail, the location of the disputed events in this case, in 1998. (Pl. SAF ¶ 3.) The DOC chain of command above Hicks at

4

the relevant times included Sergeant Henry Page, supervisor of the Central Kitchen where Hicks worked (Def. SF ¶ 8; Pl. SAF ¶ 3); Captain James Kelly,[1] the Unit Commander of the Central Kitchen (Def. SF ¶ 7); and Marcus Lyles, Assistant Director of DOC (*id.*, ¶ 6). Hicks also refers to a Sergeant Janak, Superintendent Lunk, Assistant Director Barasch, and Deputy Chief Moseley as relevant persons at DOC regarding this case, but Hicks does not specify where these persons fit in his chain of command, if anywhere. (Pl. SAF ¶¶ 27, 32, 36, 43.)

Aramark Correctional Services is a company that provides food services to various correctional facilities, including DOC. (Def. SF ¶ 10.) Ms. Mereditise (a.k.a. Mertisse) Wilson was an employee of Aramark who worked in the DOC Central Kitchen. (*Id.*, ¶ 17; Pl. SAF ¶ 7.) David Cain was a General Manager of Aramark who supervised Aramark employees in the DOC Central Kitchen for an unspecified three years, apparently in the relevant time frame. (Def. SF ¶¶ 56, 58.)

The parties disagree about the precise relationship between DOC and Aramark. Hicks does not dispute DOC's claims that Aramark is a separate and distinct entity from Cook County (Def. SF ¶ 10); that Aramark employees are independent contractors (*id.*); that Aramark employees are supervised, disciplined, and paid by Aramark (*id.*, ¶ 13); and that the Sheriff of Cook County does not have the right to fire an Aramark employee (*id.*, ¶ 14). Hicks's dispute as to the relationship between DOC and Aramark is based on the following DOC statement of fact: "In order to maintain a secure environment, the contract [between Aramark and DOC] allows the Sheriff to conduct background checks on Aramark employees for the purpose of identifying and avoiding potential security risks. In the event that an Aramark employee poses a security risk,

---

[1] Captain Kelly was a Lieutenant from 1997 to 2002, when he was promoted to Captain.

the Sheriff has the right to require that Aramark not assign that individual to work in the DOC."
(Def. SF ¶ 14 .) Hicks uses this statement in an attempt to deny DOC's statements that DOC
cannot control the staffing or discipline of Aramark employees. (*Id.*, ¶¶ 12, 13, 15; Def. Resp. ¶¶
12, 13, 15.) Hicks also asserts that DOC (1) has "significant control" over the worksite because
"individuals can only enter and leave by being buzzed through locked doors controlled by DOC;"
(2) "has the ability to prevent Ms. Wilson from entering this worksite;" (3) "has the ability to
prevent her from working at this worksite;" (4) "has the ability to change her hours of work (by
preventing her entry to the jail during certain hours);" (5) "to some degree has the ability to
change where specifically she works within DOC's premises (by refusing her entry to certain
areas of the jail);" and (6) "has some ability to cause Ms. Wilson to be disciplined." (Pl. SAF ¶
7.) Defendant responds to these statements by specifically denying only that DOC can discipline
Aramark employees, and by objecting on the grounds that these statements are not supported by
the evidence Hicks offers. (Def. Resp. ¶ 7.) But the ability of DOC to control Aramark
employees is a subject that might conceivably be within Hicks's scope of knowledge, so the
Court will not disregard his statements. It also appears undisputed that Aramark employees
agree to abide by any and all DOC rules, regulations, procedures, and General Orders regarding
Aramark's performance under the contract between DOC and Aramark. (*See* Pl. SAF, Ex. G at
Bates 245 (service contract).)

*B.*      *Alleged Harassment and Hicks's Complaints to DOC*[2]

Hicks offers testimony that from December 23, 2000, to sometime in 2002, Ms. Wilson

repeatedly directed sexual language and offensive conduct toward him in the workplace. (Pl.

SAF ¶¶ 8-17.) Defendant offers testimony from Ms. Wilson denying each allegation of such

conduct. (Def. SF ¶ 60; Def. Resp. ¶¶ 8-17.) It is, of course, not the Court's place to weigh

conflicting evidence[3] and resolve factual disputes. But Defendant argues that these disputes are

not material because even if Hicks's version of facts is correct, Defendant is entitled to summary

judgment. Thus, the Court will recite all properly-supported facts[4] as the parties have (often

graphically) presented them.

On or about December 23, 2000, in front of unnamed witnesses, Ms. Wilson told Hicks to

"lick and kiss her pussy" while she rubbed her vaginal area. (Pl. SAF ¶ 8.) She turned around,

lifted the smock she was wearing, and shouted to Hicks to "kiss her black ass." (*Id.*) On or

---

[2] The briefs and factual record are laden with a number of contested factual debates and side debates. For example, Plaintiff asserts that he is a happily married father of four who is, in fact, a reverend in his church. (Pl. SAF ¶ 1.) Ms. Wilson appears to contend that Plaintiff has made unwanted sexual advances against her (Def. SF ¶ 26), and Defendant also includes references to the testimony of other female workers from Aramark who contend that Plaintiff has made sexual and/or romantic advances towards them (*id.*, ¶ 74). Plaintiff disputes these claims, and suggests that the Aramark accusers were put up to falsely make these claims to support Ms. Wilson. (Pl. Resp. ¶ 74.) The Court does not delve into these debates, as they are not central to the resolution of the Motion.

[3] For example, Defendant points to testimony by other persons who worked in the DOC Central Kitchen that they had never heard Ms. Wilson make sexual comments in the workplace. (*See, e.g.*, Def. SF ¶¶ 47, 49, 53 (deemed admitted for lack of support for denial in response).)

[4] Defendant repeatedly objects to evidence offered from Hicks's "self-serving affidavit." But facts within Hicks's personal knowledge, including allegations by Hicks of what Ms. Wilson said to him, are properly supported by affidavit testimony. *See* Fed. R. Civ. P. 56(e); *accord Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003).

about December 25, 2000, in front of witnesses, Ms. Wilson told Hicks to "lick and suck her pussy" as she rubbed her vaginal area. (*Id.*, ¶ 9.) On approximately two occasions between December 25, 2000, and January 30, 2001, Ms. Wilson told Hicks to do certain sexual things to her, including telling him to "lick and suck her pussy" and also told him to "kiss her ass," and she rubbed her vaginal area and patted her buttocks "in a seductive and sexually inappropriate manner." (*Id.*, ¶ 10.) Between February and December 2001, approximately every two weeks, Ms. Wilson would say things to Hicks, both directly and indirectly, such as "kiss my pussy," "kiss my ass," and "fuck" while she was rubbing her vaginal area and buttocks in his presence. (*Id.*, ¶ 11.) At some point in 2001, while Hicks was in the break room, Ms. Wilson stated to him, without any provocation, "kiss my black ass" while she was patting her buttocks. (*Id.*, ¶ 12.) While Hicks was walking away from Ms. Wilson during that incident, Ms. Wilson stated, "He can lick my pussy." (*Id.*) On or about June 25, 2001, Ms. Wilson again told Hicks to "kiss and lick her ass," and told Hicks, "Don't touch my body again, don't put your fucking hands on me again." (*Id.*, ¶ 13.) (Hicks denies having tried to touch her.) On or about September 23, 2001, Ms. Wilson again told Hicks to "kiss her black ass" or any "other place Hicks could think about." (*Id.*, ¶ 14.) She also stated, in the presence of Sergeant Janak and Officer Redmond, that she was going to "fuck Hicks real good." (*Id.*)

Between January and May 2002, approximately every three weeks, Ms. Wilson would say things to Hicks, directly and indirectly, such as "lick this good pussy" and "good pussy, good pussy," while she turned her buttocks toward Hicks and rubbed herself. (*Id.*, ¶ 15.) During or near February 2002, Ms. Wilson walked down a hallway at DOC, telling Hicks to "kiss her ass" while she rubbed her intimate body parts "in a seductive and sexually inappropriate manner."

8

(*Id.*, ¶ 16.) During or near April and May 2002, on three to five occasions, Ms. Wilson, while speaking to her co-workers but looking at Hicks, stated that Hicks could "lick her pussy" and "kiss her ass." (*Id.*, ¶ 17.) At no time, according to Hicks, did he encourage Ms. Wilson to make any of these statements or engage in such alleged exhibitions. (*Id.*, ¶ 21.) Ms. Wilson did not make any similar statements towards any females at DOC. (*Id.*, ¶ 22 (admitted).)

Between December 2000 and July 2002, Hicks promptly (within the same day or by the next day) made internal complaints about Ms. Wilson's conduct, totaling 18 to 20 verbal complaints and more than seven written complaints. (Pl. SAF ¶ 27.) He complained to Sergeant Page, Sergeant Janak, Captain Kelly, Superintendent Lunk, Assistant Director Lyles, Assistant Director Barasch, and Deputy Chief Moseley. (*Id.*, ¶ 27.) None of Hicks's written complaints before December 2002 include mention of sexual misbehavior by Ms. Wilson (they all detail work-related disputes). (*See* Def. SF, Ex. 20, 22, 23; Pl. SAF ¶ I-O.) Hicks repeatedly included in his verbal complaints, however, the details of the explicitly sexual nature of Ms. Wilson's conduct and Hick's objections to such conduct.[5] (Pl. SAF ¶ 28, 29.)

In May 2002, Hicks sent a letter to the Inspector General's Office complaining of sexual harassment. (Def. SF ¶ 54.) The Inspector General is not a part of the DOC or the Internal Affairs Division at DOC. (*Id.* (deemed admitted for lack of response).) Hicks did not send this letter to any DOC personnel or to internal affairs. (*Id.* (deemed admitted for lack of response to

---

[5] Defendant denies that Hicks made such verbal complaints. (*See* Def. Resp. ¶¶ 28, 29 (denial supported by deposition testimony of DOC employees Page, Gultney, Gibbs, Carter, and Kelly).) Defendant admits that Hicks complained to Sergeant Page verbally once around Christmas of 2000 and once in either July or August of 2001 regarding work-related disputes with Ms. Wilson (Def. SF ¶ 27), but Defendant denies that Hicks complained of any sexually inappropriate comments or gestures by Ms. Wilson (*id.*, ¶ 28).

this statement).) The Inspector General informed Hicks that it did not have jurisdiction over the matter and that Aramark would have to investigate the complaint. (Def. SF ¶ 54.)

On or about December 26, 2002, Captain Kelly received a copy of a letter Hicks sent to Hicks's attorney complaining about sexual harassment by Ms. Wilson. (Def. SF ¶ 55; *id.*, Ex. 50.)

### C.    *Response by DOC*

DOC maintains a sexual harassment policy. According to the policy, unwelcome acts of a sexual nature constitute sexual harassment when submission is made a term or condition of employment, when submission is used as a basis of any employment decision affecting the individual's employment, or when such conduct has the purpose or effect of interfering with an individual's performance or creating an intimidating, hostile, or offensive work environment. (Def. SF ¶ 41.) The policy prohibits a Sheriff's employee from sexually harassing another Sheriff employee or non-Sheriff employee working on the premises. (*Id.*, ¶ 42 (deemed admitted for inapposite denial).) If an employee of DOC feels he is being sexually harassed, he is supposed to complain to his immediate supervisor, and if he does not get immediate relief he is to follow his chain of command. (Def. SF ¶ 43 (deemed admitted for inapposite and unsupported denial).) Specifically, the policy requires the victim to make a claim by completing, dating, and signing a Sexual Harassment Complaint Form and submitting it to a supervisor, who will acknowledge receipt by signing and dating the bottom of the form. (Def. SF ¶ 43 (deemed admitted for inapposite and unsupported denial).)

According to Hicks, DOC failed to protect Hicks from Ms. Wilson's unwelcome sexual comments and actions and failed to take any or appropriate action to discipline Ms. Wilson for

her behavior. (Pl. SAF ¶ 30.) Defendant denies this statement by pointing out that it did not

have the power to discipline Ms. Wilson, see *supra,* and by pointing to its prompt investigation

of the complaints detailed in Hicks's December 2002 letter, see *infra.*[6] (Def. Resp. ¶ 30.)

Defendant does not deny that the only investigation into sexual harassment claims by Hicks was

the one initiated after the December 2002 letter. (*Id.*)

In response to a complaint by Hicks concerning Ms. Wilson around December 25, 2000,

Sergeant Page initiated an investigation.[7] (Def. SF ¶ 28.) Hicks informed Page that he and Ms.

Wilson had had a disagreement in the kitchen in front of inmates over food trays and that she

used profanity towards him. (Def. SF ¶ 28.) Defendant states that Hicks did not complain about

any type of sexual behavior or comments in this complaint. (Def. SF ¶ 28.) Plaintiff states that

he did so complain. (Pl. Resp. ¶ 28.) Following the complaint, Page and Superintendent Lunk

met with Aramark Manager Cain to discuss Hicks's concerns. (Def. SF ¶ 30 (deemed admitted

for lack of evidentiary support for denial).) On January 29, 2001, Page, Hicks, and Cain met

---

[6] Defendant also challenges this statement of fact as being outside Hicks's personal knowledge. (Pl. Resp. ¶ 30.) The Court agrees that Hicks has given no reason to believe that he would be privy to all discipline actions concerning Ms. Wilson. But to the extent that any investigation was made concerning Hicks's complaints about Ms. Wilson, the Court finds it reasonable, at least for summary judgment purposes, to believe that Hicks would be aware of it. Or, put differently, the Court will interpret this gap in the summary judgment record as presented in Plaintiff's favor.

[7] Hicks states that Page should not have conducted the investigation because he was having a sexual relationship with Ms. Wilson. (Pl. SAF ¶ 31.) The Court finds absolutely no support in the record for this accusation. Hicks's own speculative testimony is not evidence. The testimony by Sheila Ligon, a former DOC employee, that she saw Page in Ms. Wilson's car one time (*see* Pl. SAF, Ex. Y at 52:7-18) does not come close to establishing a sexual relationship.

with Ms. Wilson. (Def. SF ¶ 31.) Precisely what was stated at that meeting is disputed,[8] but both Hicks and Ms. Wilson signed a counseling agreement acknowledging personality conflicts and that their conduct was unacceptable, and agreeing to work and cooperate in the future.[9] (*Id.*; Def. SF, Ex. 21.)

On September 23, 2001, a verbal altercation occurred between Hicks and Ms. Wilson involving a supposedly unsupervised inmate in the kitchen. (Def. SF ¶¶ 35-37.) The incident was observed by Aramark General Manager Cain. (Def. SF ¶ 37.) When Hicks reported the incident to Sergeant Janak, Ms. Wilson entered the office and yelled that she was supervising the inmate. (Def. SF ¶ 36 (deemed admitted for lack of denial of this statement.) Hicks then began yelling as well. (*Id.* (deemed admitted for lack of denial of this statement).) Sergeant Janak informed Ms. Wilson that Hicks was correct that the inmate should not have been in an unauthorized area. (*Id.* (deemed admitted for lack of denial of this statement).) Ms. Wilson stated that she was tired of being harassed by Hicks and that she would be "notifying the proper people." (*Id.* (deemed admitted for lack of denial of this statement).) Sergeant Janak instructed Ms. Wilson to calm down and leave the office, which she did. (*Id.* (deemed admitted for lack of denial of this statement).) Hicks stated that he had "lots of documentation" and was "going to get her" for harassing him also. (*Id.* (deemed admitted for lack of denial of this statement).) At the end of this altercation, Correctional Officer Redmond, who had observed the incident, told

---

[8] Hicks disputes that Ms. Wilson stated that Hicks had made a sexual advance toward her in 1998. (Pl. Resp. ¶ 31; Pl. SAF ¶ 31.)

[9] Hicks's statement in his response to Defendant's statement of fact that he was coerced to sign the counseling memo is not properly before the Court because it does not constitute a denial.

Hicks something to the effect of, "If I were you I would just forget about what just happened because you are opening up a can of worms. It makes no difference to the County if you are right, they [sic] the County will only look at the female's side."[10] (Pl. SAF ¶ 35.) It is not clear what, if any, action was taken by DOC or Aramark as a result of this altercation.

On January 8, 2003, Captain Kelly sent a copy of Hicks's December 2002 letter complaining of Ms. Wilson's sexual harassment to Aramark General Manager David Cain. (Def. SF ¶ 55; *id.*, Ex. 50.) Cain then conducted an internal investigation into Officer Hicks's allegations, which included interviewing Ms. Wilson and other Aramark employees assigned to the Central Kitchen area.[11] (Def. SF 56.) As a result of this investigation, Cain found no evidence corroborating or supporting Hicks's allegations of sexual harassment. (*Id.*) Cain then contacted Captain Kelly and verbally informed him of his findings and conclusions.[12] (Def. SF ¶ 57.)

In addition to the investigations described above, according to Hicks at least, DOC management employees made a number of comments to Hicks when he allegedly made verbal complaints of sexual harassment. (Defendant denies that Hicks even was making verbal complaints of sexual harassment, much less that anyone was making deprecating responses to any verbal complaints.) According to Hicks, DOC employees laughed at him (Sergeant Page, 10

---

[10] Defendant states that "Officer Redmond tried to calm Hicks down, told Mr. Hicks to 'cool off' and told him not to 'open a can of worms' without thinking things over." (Def. SF ¶ 36.)

[11] Hicks denies that the findings of this investigation are correct but does not dispute that it occurred. (Pl. Resp. ¶ 56.)

[12] Hicks denies that the findings are correct, but does not dispute that this was the conclusion. (Pl. Resp. ¶ 57.)

to 15 times; Captain Kelly, approximately 3 times; Sergeant Janak, 1 time; and Superintendent Lunk, 1 time). (Pl. SAF ¶ 32.) On more than one occasion, Sergeant Page directed Hicks to "keep it in the kitchen" (*id.*, ¶ 33) and advised Hicks to "leave it to him, that he'd speak with her [presumably Ms. Wilson], and that Hicks should not repeat his complaints to anyone else" (*id.*, ¶ 34). On or about November 2, 2001, Deputy Chief Moseley stated to Hicks that he was upset that Hicks "cc's everybody" and told Hicks something to the effect of "he's 'messed up now so just let the chips fall where they may.'" (*Id.*, ¶ 35.) Moseley also directed Hicks not to contact him anymore, advised Hicks that Moseley would contact him, and led Hicks to believe the situation would be addressed. (*Id.*) During or near February 2002, Sergeant Page told Hicks regarding his complaints to "stop this foolishness;" "to just let everything go away and everything would be all right;" "to leave it alone . . . because it wasn't going anywhere;" and "to forget about it." (*Id.*, ¶¶ 37, 38.) In that same time frame, Captain Kelly told Hicks to "be a team player" and that "Hicks was a man and [should] act like a man." (*Id.*, ¶¶ 39, 40.) Captain Kelly also suggested to Hicks that he should drop his complaints of sexual harassment by Ms. Wilson because "it wasn't going to go anywhere." (*Id.*, ¶ 41.)

On or about July 26, 2002, Hicks called and spoke with Assistant Director Barasch about Ms. Wilson's sexually abusive and offensive conduct. (Pl. SAF ¶ 43 (deemed admitted for lack of evidentiary support for denial).) Barasch advised Hicks that Hicks's packet of information had been received and reviewed (it is unclear what packet Hicks is referring to), and that Barasch had spoken with the Cook County legal department. (*Id.*) Barasch told Hicks that "everyone had agreed that this was a terrible trauma that Hicks was suffering," but that the legal department said that whatever an Aramark employee did on County property would have to be handled by

Aramark.[13] (*Id.*) At that same time, Barasch acknowledged and admitted that if such sexually abusive and offensive conduct had been committed by Hicks against a female, Cook County would have acted quickly and terminated Hicks's employment.[14] (*Id.*, ¶ 44.)

On September 25, 2002, Hicks filed a charge with the EEOC. (Pl. SAF ¶ 48; *id.*, Ex. C.) The charge listed discrimination on the basis of sex, and stated, "Since December, 2000 I have had at least three incidents with one of Aramark's female kitchen managers. This individual has been crudely verbally abusive to me." (*Id.*) After Hicks filed the EEOC charge, Ms. Wilson's shift changed, resulting in her not crossing paths with Hicks. (Pl. SAF ¶ 48.)

Precisely what was reported by Hicks during the EEOC investigation is disputed by the parties. The EEOC investigator's notes show that when asked for details of what Ms. Wilson did to him, Hicks reported that on three occasions Ms. Wilson lifted her smock, pointed at her behind, and said that he could "kiss her ass". (Def. SF ¶ 21; *id.*, Ex. 12 at 2.) The investigator's notes say that Hicks said that Ms. Wilson would walk into his face and say that she was going to

---

[13] Defendant admits that Aramark would have to handle the problem. (Def. Resp. ¶ 43.) The other statements are deemed admitted for lack of evidentiary support for the denial. (*Id.*) Defendant objects to the statement on hearsay grounds, among other objections. (*Id.*) Defendant does not specify why the statement that the legal department acknowledged that Hicks suffered a trauma is hearsay (it may be a party admission). The Court believes, however, that Hicks is offering the statement, not for the truth of the matter asserted (since the legal department's belief is not relevant to the legal questions before the Court), but to show that DOC was aware of the ongoing actions by Ms. Wilson. *See* Fed. R. Evid. 801(c). Thus, the Court will accept the statement for that purpose.

[14] This statement is deemed admitted against DOC for failure to support its denial with evidence from the record. (Pl. Resp. ¶ 44.) Defendant makes another hearsay objection without specifying the grounds for the objection. The Court believes that this statement is being offered for the truth of the matter asserted (how DOC would treat a male versus a female). Given the apparent managerial status of Barasch and Defendant's failure to inform the Court as to why Barasch would have been making a statement outside the scope of his employment, the Court will accept this statement as an admission by a party-opponent. *See* Fed. R. Evid. 801(d)(2).

"fuck him up" and told him that he will suffer if he does not leave this alone. (*Id.*) Hicks admits

that he said these things, but also claims that he told the investigator that Ms. Wilson told Hicks

to "lick and kiss her pussy" while she rubbed herself. (Pl. Resp. ¶ 21.) The investigator's notes

also state that Hicks said that Ms. Wilson had never come onto him in a sexual manner, never

asked him for sex, and never made any sexual comments to him. (Def. SF ¶ 22; *id.*, Ex. 12 at 2.)

Hicks denies that he said these things to the investigator. (Pl. Resp. ¶ 22.) On October 21, 2002,

the EEOC issued a dismissal and right to sue letter. (Def. SF ¶ 23.) On January 5, 2003, Hicks

filed a second EEOC charge. (*Id.*, ¶ 24.) He subsequently requested a right to sue letter on that

charge, which was issued to him on January 10, 2003. (*Id.*) On January 15, 2003, Hicks filed his

initial complaint with this Court. (*Id.*, ¶ 25.)

### D. Alleged Retaliation and Interference with Hicks's Conditions and Performance of Employment

Hicks states the certain actions were taken against him in retaliation for filing his federal

lawsuit. On approximately three undated occasions, after Hicks would complain to Captain

Kelly about the harassment, Captain Kelly would assign Hicks to the "East Dock" for three to

four days, which Hicks characterized as highly disagreeable because it is a secluded spot away

from everyone. (Pl. SAF ¶ 45.) Hicks claims that between January 23 and February 15, 2003, he

was assigned to the East Dock 13 times, which was more frequently than he had been assigned

there before.[15] (*Id.*, ¶ 52(d).) Hicks characterizes the East Dock assignment as "punishment" and

pointed to the fact that he would have to wait for relief before he could go to the bathroom,

which on occasion took several calls and necessitated an apparently long (but not quantified)

---

[15] Hicks also claims that this was more than any other officer who had not filed a lawsuit.
(*Id.*, ¶ 52(c).) Hicks offers no evidence of assignments of other officers, however.

delay such that his "kidneys would start hurting." (*Id.*) Hicks offered no evidence as to whether other officers were relieved in a more timely fashion. Defendant offered testimony evidence that the East Dock was not generally considered to be either a punishment or non-preferred assignment, and was indeed preferred by certain officers. (Def. Resp. ¶ 52(d); Def. SF ¶ 66.)

On or about April 24, 2003, Sergeant Smith instructed Hicks not to bring complaints or other work-related needs to Aramark staff or to speak to Aramark staff. (Pl. SAF ¶ 52(a).) Captain Kelly gave him the same instruction in that time frame. (*Id.*) All other correctional officers were allowed to speak to Aramark employees. (*Id.*) Thereafter, if Hicks needed something from Aramark, he would have to speak with Sergeant Smith, which would delay his obtaining the item for one to two hours. (*Id.*)

Hicks maintains that on five to eight occasions, Sergeant Page raised his voice at Hicks, which had not happened prior to Hicks filing the law suit. (Pl. SAF ¶ 52(b).) Sergeant Page's general demeanor toward Hicks purportedly changed. (*Id.*) On one occasion, Sergeant Page berated Hicks for wearing black gym shoes, which were worn by other officers who were not so treated. (*Id.*)

From the spring of 2003 to January 25, 2004, Defendant precluded Hicks from having access to a certain filing cabinet to which he had access for the prior three years. (*Id.*, ¶ 52(c).) The filing cabinet contained supplies and forms that Hicks needed to do his job. (*Id.*) Hicks would need to find another officer (it is not clear who) to go into the filing cabinet. (*Id.*) At least one other correctional officer was allowed access to the cabinet.[16] (*Id.*)

---

[16] Hicks states, "Defendants did not preclude other correctional officers who did not complain of same from looking in." (Pl. SAF ¶ 52(c).) Hicks's only record evidence of this broad statement, however, is that he saw one Officer DeBerg go into the cabinet without

On or about May 2, 2003, Hicks was transferred from the Central Kitchen to Division 10 (an unexplained duty station). (*Id.*, ¶ 52(e).) Defendant explains that Hicks was transferred pursuant to DOC policy because he was being investigated for allegations of sexual harassment made by three Aramark female employees. (Def. SF ¶ 76, 77.) (Apparently the female Aramark employees accused Hicks of inappropriately making sexual advances towards them; Hicks denies he did anything of this sort and suggests the Aramark employees fabricated the accusations to support Ms. Wilson. (*See* Pl. Resp. ¶ 74.) The policy gives DOC the discretion to transfer a correctional employee under investigation. (Def. SF, Ex. 31 at 37, Sec. 14.4 I.B (collective bargaining agreement).) It is not clear who makes the decision to transfer, what factors go into that decision, or how typical it is to transfer an employee under investigation. The DOC investigator ultimately determined that there was insufficient evidence to either prove or disprove the allegations made by the Aramark employees and closed the investigation. (Def. SF ¶ 79.) Hicks claims that the investigation by the Internal Affairs Department into the allegations of sexual harassment by him was itself a form of retaliation. (Pl. SAF ¶ 52(f).)

In October and November 2003, DOC directed Hicks to take two drug tests, both of which came back negative. (Pl. SAF ¶ 52(f).) Hicks claims that these tests were not random, as DOC policy requires. (Def. SF ¶ 90.) Hicks offers no evidence to support his contention that the tests were *not* random other than his own opinion and speculation. (Def SF ¶ 93.) Because the selection of persons for drug testing is outside of Hicks's personal knowledge and because Hicks offers no evidence beyond his own speculation, the Court will not accept Hicks's characterization of the drug tests as anything other than random.

_____

supervision. (Pl. SAF, Ex. X at 168-72.)

On October 23, 2003, Defendant de-deputized Hicks, telling him that it was because he was seeing a psychiatrist. (Pl. SAF ¶ 52(h).) During the internal affairs investigation of Hicks's alleged sexual harassment, Hicks informed the investigator that he was under the care of a psychiatrist. (Def. SF ¶ 83 (deemed admitted for inapposite denial).) As a result of this information, Defendant took Hicks's gun and credentials. (Pl. SAF ¶ 52(h).) Before he could be re-deputized, Hicks had to obtain a written statement from a psychiatrist that there was no medical or psychiatric reason to prevent Hicks from being in charge of his weapon; this interview and report cost Hicks $250 to obtain. (Id.) The report from the psychiatrist was submitted on November 24, 2003, and Defendant re-deputized Hicks on January 12, 2004. (Id.)

Finally, Hicks claims that he was retaliated against when Defendant attempted to prevent him from attending depositions of DOC's management employees for this lawsuit. (Pl. SAF ¶ 52(i).) According to Hicks, Defendant rescheduled an annual in-service training to take place the week of the scheduled depositions. (Id.) Hicks admits, however, that Defendant allowed Hicks to reschedule his training, and Hicks was able to attend the depositions and attend the in-service. (Def. SF ¶¶ 94, 95.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). To avoid

summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

It bears emphasis that this case is before the Court on a summary judgment motion. Both sides make various arguments that are essentially predicated on assessments of who is telling the truth and whose claims are too implausible to credit. The Court cannot engage in such assessments when deciding whether summary dismissal is warranted.

## DISCUSSION

Title VII forbids an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Title VII also forbids an employer to "discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge . . . under this subchapter." 42 U.S.C. § 2000e-3(a). Hicks alleges that DOC violated Title VII by subjecting him to a hostile work environment (Claims I and II), by discriminating against him because of his sex in failing to protect him from and act on his allegations of sexual harassment (Claim III), and by retaliating against him for filing a charge with the EEOC and for filing this lawsuit (Claim V). Hicks also alleges under 42 U.S.C. § 1983 that DOC violated his right to equal protection under the laws by treating him differently than it treats its female employees who complain of sexual harassment (Claim IV).

I.      Sexual Harassment Claims (Counts I and II)[17]

In order for Hicks to prevail on a claim of sexual harassment based on hostile work environment, he must establish that: "(1) [he] was subjected to unwelcome sexual harassment; (2) the harassment was based on [his] sex; (3) the sexual harassment unreasonably interfered with [his] work performance by creating an intimidating, hostile or offensive work environment that affected seriously the psychological well-being of the plaintiff; and (4) there is a basis for employer liability." *McPherson v. City of Waukegan* 379 F.3d 430, 437-38 (7th Cir. 2004).

A.      *Plaintiff Has Created a Genuine Issue of Fact As to Whether He Was Subject to a Sexually Hostile Work Environment*

Defendant argues that Plaintiff has not established that the alleged conduct rose to the level of a sexually hostile work environment. Defendant argues that Ms. Wilson's alleged conduct constituted "clear expressions of acrimony over work related disputes" (D.E. 37,

---

[17] Defendant initially argues that Plaintiff's charges of sexual harassment (Counts I and II) should be dismissed because they are outside the scope of his EEOC charge. This argument apparently stems from two concerns: (1) that the charges in Hicks's complaint purportedly cannot be inferred from his first EEOC charge of discrimination (Def. SF, Ex. 11); and (2) that Hicks's second, more detailed EEOC charge (*id.*, Ex. 14), which Defendants argue is inconsistent with his first charge, cannot be used to expand the scope of his first charge.

The Court can quickly dispose of this argument in Plaintiff's favor. Hicks clearly detailed his claims of sexual harassment based on a hostile work environment and sex discrimination in his second EEOC charge. Defendant has failed to provide this Court with a single citation to legal authority to support its contention that Hicks may not rely on the second EEOC charge as the basis for his federal complaint. Because the scope of the EEOC charge in relation to the federal complaint is not a jurisdictional question that the Court must take up on its own accord, *see Babrocky v. Jewel Food Co.*, 773 F.2d 857, 864 (7th Cir. 1985) ("[T]he requirement that the scope of the EEOC charge limit the scope of the subsequent complaint is in the nature of a condition precedent with which litigants must comply rather than constituting a component of subject matter jurisdiction."), the Court will not award summary judgment to Defendant on a ground so presented. Thus, the Court finds that the claims in Hicks's second amended complaint are reasonably related to and grow out of the allegations in his second EEOC charge. *See Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 689 (7th Cir. 2001).

Memorandum of Law at 9) rather than gender-related conduct, and that Ms. Wilson's alleged conduct was not sufficiently severe or pervasive to alter the conditions of Hicks's employment or to create an abusive working environment.

Whether Hicks has established that he was harassed because of his gender is a triable question (giving Hicks the benefit of all disputed issues and inferences that flow therefrom). In this regard, the Supreme Court teaches that workplace harassment is not "automatically discrimination merely because the words used have sexual content or connotations." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1995). "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring)). In the case of male-female sexual harassment, the Court has noted that "[c]ourts and juries have found the inference of discrimination easy to draw . . . because the challenged conduct typically involves explicit or implicit proposals of sexual activity; [thus] it is reasonable to assume those proposals would not have been made to someone of the same sex." *Id.* Regardless of any kind of assumption, however, the Supreme Court instructs that a plaintiff "must always prove that the conduct at issue was not merely tinged with sexual connotations, but actually constituted discrimination because of sex." *Id.* at 81 (internal quotation omitted).

The Seventh Circuit has made clear that other bases for harassment, whether acrimony over work-related disputes, *see Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1085 (7th Cir. 2000), or problems from a failed relationship, *see Galloway v. General Motor Serv. Parts Operations*, 78 F.3d 1164, 1168 (7th Cir. 1996), *overruled in part on other grounds by Nat'l R.R.*

22

*Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), cannot constitute actionable conduct under Title VII. Here, Defendant claims that Hicks and Ms. Wilson were involved in a testy work-related dispute, apparently over food trays that Hicks needed from Ms. Wilson. (*See* Def. SF, Ex. 20, 22, 23.) Defendant argues that this evidence, combined with Hicks's failure to provide any evidence that the harassment was gender-related, defeats Hicks's sexual harassment claim. For his part, Hicks relies on two factors to establish the gender-related basis of Ms. Wilson's actions: the overt (indeed graphic) sexual overtones and content of the language itself, and the fact that Ms. Wilson never made sexually abusive statements to any females at the workplace.

On their face, Ms. Wilson's alleged statements constituted invitations to perform certain sexual acts upon her. The numerous comments were typically a version of, as Hicks describes them, "kiss my ass" and "lick my pussy." Taken alone, "kiss my ass" does not establish that Ms. Wilson's conduct was "because of" Hicks's sex. The phrase is certainly crass, and it is an inappropriate one for the workplace, at least under many circumstances. Nonetheless, at the risk of dating oneself, the phrase is no more than a crude version of the then-acclaimed "kiss my grits" line from the 1970s television show "Alice," a primetime program that also coincidentally involved, like this case, a workplace/kitchen. In current usage, this phrase has no overt gender bias, and Hicks has offered no evidence of one. *See generally Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431 (7th Cir. 1995) (rejecting sexual harassment claim relating to unwanted solicitations of sales manager and stating, *inter alia*, "[h]e never said anything to her that could not be repeated on primetime television.").

On the other hand, repeated invitations to someone of the opposite sex to lick one's genitalia or perform oral sex acts cannot be dismissed so easily. Ms. Wilson's actions were

23

targeted to Hicks alone,[18] and they were accompanied by Ms. Wilson rubbing herself in what

Hicks claims was a "seductive and sexually inappropriate manner." (*See* Pl. SAF ¶ 10.) On the

basis of this (hotly disputed) record, whether Ms. Hicks directed this language and conduct

toward Hicks because of his sex rather than because of a work-related dispute is a sufficiently

fact- and context-specific question to be decided by a jury.[19]

Defendant next argues that Ms. Wilson's alleged conduct was not severe or pervasive

enough to constitute a hostile work environment. To prove that a hostile work environment

existed, Hicks must put forth sufficient evidence that he "was subjected to conduct so severe or

pervasive as to alter the conditions of employment and create an abusive working environment."

---

[18] Defendant admits that Ms. Wilson did not direct any sexually abusive comments or conduct comments toward other women at DOC. (*See* Pl. SAF ¶ 22; Def. Resp. ¶ 22.) The Court notes that had Defendant not admitted this fact (*see* Def. Resp. ¶ 22), the Court would have been inclined to find that Hicks's record evidence was insufficient to support his factual assertion. Hicks may be able to testify that neither he nor Mr. Morris (a former DOC employee) ever heard Ms. Wilson make similar comments to females, but that does not necessarily establish that she never made those comments. In light of the admission by Defendant, however, the Court need not decide that evidentiary question.

[19] In this regard, it is useful to consider a situation where a male worker repeatedly suggests that a female coworker (and only that coworker) should perform oral sex on him. The male worker (in addition to denying that he made the statements) suggests that any statements, if made, simply reflect ongoing animus related to workplace disputes between the parties and are not any evidence of sexual harassment. A factfinder *might* credit the notion that the male worker was uttering such statements because of the other workplace disputes, and that the statements are not any "discrimination because of sex," *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1995), but the jury would need to make that assessment. *See generally Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 808 (7th Cir. 2001) (collecting cases and teaching that "[i]nappropriate conduct that is inflicted regardless of sex is outside the statute's ambit," but harassment directed to another because of their sex is prohibited) (internal punctuation and citations omitted). An (extraordinarily crude) male might make such inappropriate comments simply as an alternative to expressing displeasure related to other workplace disputes in some other fashion, but whether that claim would be credited would turn on the relative credibilities of the witnesses involved and an assessment of body language, tone of voice, the look on the speaker's face, etc.

*McPherson*, 379 F.3d at 438 (internal quotation omitted); *accord Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998). "To qualify as hostile, the work environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *McPherson*, 379 F.3d at 438 (internal quotation omitted); *accord Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 807 (7th Cir. 2000). In determining whether Hicks's work environment was objectively hostile, the Court "must consider all of the circumstances, including the frequency and severity of the conduct; whether it was threatening and/or humiliating or merely an offensive utterance; and whether the harassment unreasonably interfered with her work." *McPherson*, 379 F.3d at 438 (citing *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 975-76 (7th Cir. 2004)).

Defendant argues that Hicks cannot establish that the alleged sexual harassment was either subjectively or objectively sexually hostile. Defendant's argument rests almost entirely on evidence it apparently believes contradicts Hicks's version of events. For example, Defendant argues that Hicks admitted in the EEOC investigation that Ms. Wilson's comments to him were not sexual (*see* Def. SF ¶ 22) and that memos Hicks wrote to DOC did not contain allegations of overtly sexual conduct (*see id.*, Ex. 20, 22-23, 57). This evidence may ultimately prove that Hicks's version of Ms. Wilson's actions is not correct or credible (a point that the Court does not reach), but summary judgment is not the place to weigh such evidentiary matters. Hicks has consistently alleged in this lawsuit that the conduct was overtly sexual, a fact within his personal knowledge.

Hicks's affidavit and deposition testimony alleges conduct that occurred consistently, as often as every two or three weeks, throughout an almost two-year period. If true, Hicks was

subject to well more than the mere occasional or infrequent comments. *Compare, e.g., Pryor v. Seyfarth, Shaw, Fairweather & Geraldson*, 212 F.3d 976, 977-78 (7th Cir. 2000) (five comments over half a year not a hostile work environment). As for the severity of the conduct, the Seventh Circuit teaches that drawing the line between merely vulgar behavior and sexually harassing behavior is not always easy. "On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers." *Worth v. Tyer*, 276 F.3d 249, 267 (7th Cir. 2001). Ms. Wilson's alleged comments and gestures, if true, are beyond "vulgar banter" and are well beyond mere innuendo.

Hicks alleges a number of ways that he was inconvenienced by Ms. Wilson's alleged conduct. He claims that he would actively avoid Ms. Wilson in the workplace. (Pl. SAF ¶ 18.) Hicks claims that he was intimidated by Ms. Wilson, so he would not ask her for supplies, which would delay his work while he found someone else to help him. (*Id.*, ¶ 25.) Hicks also claims that he would use a more distant washroom and changed his path to avoid being in the same area as Ms. Wilson. (*Id.*, ¶¶ 25, 26.) While these actions are not particularly significant disruptions of Hicks's workplace, combined with the frequency and severity of the alleged abuse, the Court finds that Hicks has created a triable issue of material fact as to whether Ms. Wilson's alleged conduct rises to the level of a sexually hostile work environment.

B.     *Plaintiff Has Established a Genuine Issue of Material Fact As to Whether There Is a Basis for Employer Liability*

An employer is vicariously liable for any actionable hostile work environment created by

a supervisor with authority over the victim employee if it knew or should have known about the conduct and failed to stop it. *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998). An employer may be held liable for co-worker harassment only if the employer was negligent in either discovering or remedying the harassment. *Williams v. Waste Mgt. of Ill.*, 361 F.3d 1021, 1029 (7th Cir. 2004). *See also Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1073-74 (10th Cir. 1998) (collecting cases and stating, "We agree with our sister circuits that an employer may be found liable for the harassing conduct of its customers." [. . .] "Moreover, we agree with those courts that have applied a negligence theory of liability [with respect] to the harassing acts of customers."); *accord Menchaca v. Rose Records, Inc.*, No. 94 C 1376, 1995 WL 151847, at *2-4 (N.D. Ill. Apr. 3, 1995) (Plunkett, J.) (denying summary judgment to defendant-employer of employee allegedly harassed by customer). Ms. Wilson was not Hicks's supervisor, so the latter negligence standard applies.

Defendant argues that summary judgment is proper on Counts I and II because it cannot be held liable for any harassment by Ms. Wilson. First, Defendant argues that it cannot be liable for the actions of a person who is an employee of Aramark and not the Department of Corrections. Second, Defendant argues that even if it could be liable for the conduct of a non-employee, it is still entitled to summary judgment because Defendant was not negligent in discovering or remedying the harassment.

Defendant relies on *Berry v. Delta Airlines, Inc.*, 260 F.3d 803 (7th Cir. 2001), to support its argument that DOC should not be liable for Ms. Wilson's actions, as she is an employee of Aramark. In *Berry*, a Delta Airlines employee was sexually harassed by an employee of Argenbright Security, an independent contractor for Delta. The court began its liability analysis

by noting that "it is not immediately clear that [the] employer liability standard should apply because [the Argenbright employees] were contractors who were not directly employed by Delta." *Id.* at 811. The court pointed to other circuits that have followed an EEOC guideline[20] and have held that an employer may be responsible for the acts of non-employees where the employer "knows or should have known of the conduct and fails to take corrective action." *Id.* (citing 29 C.F.R. 1604.11(e); *Lockard*, 162 F.3d at 1072-74; *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 479-81 (5th Cir. 1989); *Barbour v. Browner*, 181 F.3d 1342, 1348-49 (D.C. Cir. 1999)). Importantly, the court expressed concern that these out-of-circuit cases might be read to hold that an employer can be *vicariously liable* (*i.e.*, liable without any independent showing of employer negligence) under Title VII for sexual harassment committed by an employee of an independent contractor, as opposed to being liable *for its own negligence in addressing the problem*. *Berry*, 260 F.3d at 812. The former, the court reasoned, would appear to be in tension with Supreme Court precedent. *Id.* (citing *Ellerth*, 524 U.S. at 754-60; *Faragher*, 524 U.S. at 801-04). The latter the Seventh Circuit apparently did not see as a concern, as it was expressly distinguished by the court. *See Berry*, 260 F.3d at 812 ("To the extent that . . . cases provide that an employer can be held vicariously liable under Title VII for sexual harassment committed by an employee of an independent contractor (and not merely for its own negligence in addressing the problem), they would appear to be in tension with recent Supreme Court precedent, since an

---

[20] "An employer may also be responsible for the acts of non-employees, with respect to sexual harassment of employees in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action. In reviewing these cases the Commission will consider the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of such non-employees." 29 C.F.R. 1604.11(e).

employee of an independent contractor typically cannot be considered an agent of the employer.") (citations omitted). In any event, the court declined to decide the case on this ground, ruling that Delta had not been negligent in responding to the harassment allegations. *Id.*

At least one of the cases cited by *Berry* considers a different question than that before this Court today: what is a defendant's liability for sexual harassment of a plaintiff who is a non-employee—for example, when a franchisor-defendant is implicated in a case involving a plaintiff who works for a franchisee. *See Lockard,* 162 F.3d at 1071 (plaintiff who worked for franchisee of defendant-franchisor unable to recover from franchisor on facts of case, although liability could be present on different facts); *see also Romano v. U-Haul Int'l,* 233 F.3d 655, 662, 668 (1st Cir. 2000) (holding defendant-parent company and local company liable in setting described as a "complex contractual relationship between two entities," where plaintiff worked for the local company related to parent-defendant). Here, there is no question that DOC is Hicks's employer. The two cases cited in *Berry* that are most analogous to the case at bar, *Barbour* and *Waltman,* do not decide the question of the relationship between the harassers and the defendant, and indeed, do not even meaningfully address the issue. *See Barbour,* 181 F.3d at 1348 (reversing judgment because harassment by employees of contractor not sufficiently severe to constitute actionable harassment); *Waltman,* 875 F.2d at 471 (finding triable issue of whether employer failed adequately to remedy alleged harassment, with alleged acts of employees of independent entity constituting part of total alleged harassment); *see also id.* at 483 n.3 (Jones, J., dissenting) (noting it would be difficult to see how defendant would be liable for actions of non-employees as contractor had reprimanded its employees after learning of their harassment). On the other hand, courts in this District have applied the EEOC standard of negligence liability to situations

29

involving harassment by a non-employee. *See Zupan v. State*, No. 95 C 1302, 1999 WL 281344, at *4 (N.D. Ill. Mar. 31, 1999) (Williams, J.) (collecting cases and holding on the facts of the case that state and county circuit court were not liable for harassment of court employee by sheriff's deputy); *Jarman v. City of Northlake*, 950 F. Supp. 1375, 1377-79 (N.D. Ill. 1997) (Aspen, J.) (declining to dismiss hostile work environment claim by city employee based on allegations against elected official over whom "it seem[ed] clear" the city had "substantial control").

While the Court notes and is mindful of the concern articulated in *Berry*, this case is distinguishable and is not predicated on a theory of vicarious liability as to the Defendant. Here, Hicks is suing DOC on a theory of liability based on its own negligence in not addressing the sexual harassment by Ms. Wilson. Even assuming that DOC is correct that it did not have the authority to control an Aramark employee, Defendant has offered no reason that it should not have at least tried to address the problem when Hicks was (allegedly) repeatedly complaining of the harassment.[21] The liability for co-worker sexual harassment is, after all, one of negligence. *See, e.g., Longstreet v. Ill. Dep't of Corr.*, 276 F.3d 379, 381 (7th Cir. 2002) (employer liable for harassment by co-worker "if it negligently failed to take steps to remedy the illegal harassment") (citing *Smith v. Sheahan*, 189 F.3d 529 (7th Cir. 1999)); *Berry*, 260 F.3d at 813 (inquiry is whether employer's corrective response to sexual harassment is "reasonable and adequate under the circumstances"). DOC could have notified Aramark of Hicks's allegations of Ms. Wilson's actions and asked it to investigate, as it did after DOC received Hicks's December 2002 letter

---

[21] Whether Hicks's alleged verbal complaints were sufficient to give DOC notice of the alleged harassment is discussed, *infra*.

complaining of sexual harassment. (Def. SF, Ex. 50.) Such action would require no control over Ms. Wilson by DOC and could perhaps be considered reasonable and adequate under the circumstances (although the Court does not reach that issue). On this record, particularly given the demonstration that DOC had the ability to instigate an investigation by Aramark, the Court finds that Ms. Wilson's status as a non-employee does not preclude liability by DOC if it is otherwise liable under Seventh Circuit negligence standards.

Defendant next argues that even if it could be liable for the conduct of a non-employee, it is still entitled to summary judgment because Defendant was not negligent in discovering or remedying the harassment. In particular, Defendant argues that Hicks did not complain of sexual harassment and did not follow proper procedures concerning reporting alleged sexual harassment. Hicks responds that DOC has not shown it promptly corrected any sexually harassing behavior. Because DOC responded promptly after receiving Hicks's December 2002 letter, Hicks's argument defeats summary judgment only if he is correct that his earlier verbal complaints sufficiently put the Defendant on notice of the alleged sexual harassment. "Since an employer is not omniscient, it must have notice or knowledge of the harassment before it can be held liable." *Durkin v. City of Chicago*, 341 F.3d 606, 612 (7th Cir. 2003.)

DOC has a system for the making and forwarding of complaints about sexual harassment. (*See* Def. SF, Ex. 29.) The reporting procedure under the policy details the following steps: First, the victim will inform the harasser that such conduct is unwelcome. (*Id.*, III.B.1) Second, the employee will fill out a Sexual Harassment Complaint Form and report the incident to his supervisor (or next in command, if the harasser is the supervisor). (*Id.*, III.B.2) The employee is also given the option of reporting the harassment directly to the department head on the same

form. (*Id.*) After acknowledging receipt of the complaint, the person with whom the complaint was lodged is to initiate a written, documented inquiry into the allegations and refer the complaint to the Inspector General's Office via the Internal Affairs Division for resolution. (*Id.*, III.B.3, 4, 5.)

It is undisputed that Hicks did not file a formal written complaint of the kind described above. Nor is it disputed that he did not file any written complaint until 2002 that described sexual conduct by Ms. Wilson. (*See* Pl. SAF, Ex. I-O (memos describing work-related disputes, including Ms. Wilson's use of "kiss my ass"); Def. SF, Ex. 55 at 1, 4 (employee complaint filed by Hicks with the Cook County Department of Human Rights dated July 15, 2002, alleging what he labeled "sexual harassment"); Def. SF, Ex. 50 (letter from Hicks to his attorney dated Dec. 26, 2002, apparently forwarded or copied to Sergeant Page, alleging sexual harassment).) The parties dispute whether Hicks made any verbal complaints to his superiors about Ms. Wilson's sexual harassment. For the purposes of this motion, however, the Court accepts Hicks's (hotly disputed) version of the facts—*i.e.*, that he informed numerous supervisors of the sexual nature of the harassment throughout the time period it occurred. Thus, the question is whether Hicks's verbal notification was sufficient to give notice to DOC of the harassment.

Defendant cites to *Durkin v. City of Chicago*, 341 F.3d 606, 613-14 (7th Cir. 2003), for the proposition that an employee who does avail herself of the procedures provided for reporting sexual harassment prevents the employer from receiving sufficient notice of the harassment. *Durkin*, however, does not categorically hold that notice *must* be given through the precise channel outlined by the employer. The court held, "While there could be instances where this approach [complaining to persons other than the one designated by the employer] is sufficient to

32

put the employer on notice, this is not one of them." *Id.* at 614; *see generally Faragher*, 524 U.S. at 807-08 (evidence that employee unreasonably failed to utilize complaint procedure provided by employer can be evidence supporting defense of employer to charge of supervisor-based hostile workplace environment claim). In *Durkin*, the victim's complaints, the court noted, were vague, and she never expressed her concern about matters of a sexual nature. *Id.* Here, to the contrary, Hicks has testified that he complained of the specific sexual details to his supervisors—ranging from Sergeant Page, his direct supervisor, to an assistant director of the department. Defendant does not seriously argue that it would not have had notice of the harassment from these verbal complaints if they were made; instead, Defendant asserts that Hicks never made the verbal complaints at all and notes that Defendant responded promptly after the December 2002 written complaint filed by Hicks. At the very least, Hicks has demonstrated that a genuine issue of material fact exists as to whether DOC had actual notice of his complaint. Hicks's failure to follow the technical requirement of submitting his complaint in writing does not automatically defeat this claim. *Cf. Meritor Savings Bank v. Vinson*, 477 U.S. 57, 72 (1986) ("[W]e reject petitioner's view that the mere existence of a grievance procedure and a policy against discrimination, coupled with respondent's failure to invoke that procedure, must insulate petitioner from liability.").

    In sum, Defendant has not established that there is no basis for DOC's liability for its own purported negligence, and Hicks has demonstrated there is a genuine issue of material fact as to whether he was subject to a sexually hostile work environment. Thus, Defendant's motion for

summary judgment on Counts I and II is denied.[22]

II.    Sex Discrimination Claim (Count III)

In Count III, Hicks alleges that DOC has discriminated against him based on his sex in the terms and conditions of his employment. Defendant argues that Hicks has put forth no direct evidence of gender discrimination and has failed to establish a *prima facie* case under the indirect method of proof. Defendant's latter argument is that Hicks has not suffered a materially adverse employment action and has put forth no similarly situated individuals who were treated more favorably than he. Because the Court finds, as described below, that Hicks has not suffered an adverse employment action, it need not address the other contentions.[23]

In order for Hicks to prevail on a claim of sex discrimination, he must present evidence of discriminatory intent, whether by direct or circumstantial evidence, or under the familiar *McDonnell Douglas* burden-shifting framework. *See Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 691. Either way, he "must prove that the 'terms, conditions, or privileges of employment' were affected, 42 U.S.C. § 2000e-2(a)(1); that is, [he] must show that [he] suffered a materially adverse employment action." *Id.* (citing, *inter alia, Russell v. Bd. of Trs. of Univ. of Ill.*, 243 F.3d 336, 341 (7th Cir. 2001).) What is considered adverse depends on both quantitative and

---

[22]    The parties do not differentiate between the viability of any claims under Counts I and II, in that their respective arguments are made as to both counts together. Accordingly, the Court analyzes the two counts together as well.

[23]    The Court does note, however, that Hicks provides no explanation of how his purported direct evidence, laughter by his supervisors (most of whom were male) on his reported harassment and their attempts to dissuade him from pursuing his claims, is supposed to establish discriminatory intent on the part of DOC based on his gender. The Court also notes that the only person Hicks offers as a comparator, were he to proceed under *McDonnell Douglas* (although the Court finds it difficult to ascertain Hicks's theory of liability), is Ms. Wilson, who is not an employee of DOC and therefore not similarly situated to Hicks.

qualitative changes in the terms or conditions of employment, but "not everything that makes an employee unhappy is an actionable adverse action." *Id.* (internal quotation omitted). Adverse employment actions include a "broad array of actions such as 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or some other action causing a significant change in benefits.'" *McKenzie v. Milwaukee County*, 381 F.3d 619, 625 (7th Cir. 2004) (quoting *Ellerth*, 524 U.S. at 761). "To be actionable, an employment action must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Id.* (quoting *Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002)).

Hicks makes a single conclusory statement in his summary judgment response : "[T]here was repeated interference in Hicks' employment with regards to Ms. Wilson's conduct having greatly interfered with Hicks' performance of his duties [which DOC did nothing to prevent] thereby further emboldening her to act against Hicks and increasing the unreasonable interference and fear in his performing his daily work duties." (D.E. 42 at 16.) Hicks has failed to set out any specific changes to his terms of employment caused by Ms. Wilson's conduct. The mere "inconveniences" caused by Ms. Wilson described in Hicks's statement of additional facts, such as Hicks's taking alternate routes through the facility or using a more distant washroom to avoid Ms. Wilson (Pl. SAF ¶¶ 25, 26), do not rise to the level of an adverse employment action.

Hicks has failed to establish that he has suffered a materially adverse employment action, an element essential to his case, and summary judgment is proper on his claim of sex discrimination. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Thus, Defendant's motion for summary judgment is granted with respect to Count III.

III.     Equal Protection Claim (Count IV)

In Count IV, Hicks alleges that DOC has a policy and practice that if a female is sexually harassed, Defendant promptly investigates the situation and disciplines the male harasser, whereas allegations of sexual harassment *by* a female are not promptly investigated and female harassers are not disciplined. Thus, Hicks argues, Defendant has violated his right to equal protection under the law, and his claim is actionable under 42 U.S.C. § 1983. Defendant argues that it is entitled to summary judgment on Plaintiff's Equal Protection claim because Hicks cannot point to any discriminatory policy nor can he identify a single woman who was treated better under similar circumstances.

To prevail on a § 1983 claim based on sexual harassment, a plaintiff must demonstrate actionable sexual harassment and that the discrimination was intentionally based on the plaintiff's gender. *See Bohen v. City of E. Chicago, Ind.*, 799 F.2d 1180, 1186 (7th Cir. 1986); *Zoch v. City of Chicago*, No. 94 C 4788, 1997 WL 89231, at *38 (N.D. Ill. Feb. 4, 1997) (Manning, J.). Municipalities do not have respondeat superior liability under § 1983. *Garrison v. Burke*, 165 F.3d 565, 571 (7th Cir.1999). To show § 1983 liability on the part of the DOC, Hicks must show that his constitutional injury was caused by his superiors at DOC acting (1) pursuant to an express policy of the City; (2) pursuant to an unofficial, widespread policy or custom "so permanent and well settled as to constitute a custom or usage with the force of law"; or (3) as a "final policymaking authority." *Id.* at 571-72 (citing *Baxter v. Vigo County Sch. Corp.*, 26 F.3d 728, 734-35 (7th Cir. 1994)) (internal quotations omitted). Hicks has put forward sufficient evidence to establish a genuine issue of material fact as to whether DOC is liable under § 1983.

For the reasons described above, Hicks has established a genuine issue of material fact as to whether he suffered from actionable sexual harassment. In addition, Hicks has presented sufficient evidence that, if true, would establish that DOC had so customarily ignored his complaints of sexual harassment as to constitute an "custom or usage" for the purposes of § 1983 liability.[24] In *Bohen v. City of East Chicago, Indiana,* 799 F.2d 1180 (7th Cir. 1986), a female employee of the city fire department who had complained of continual sexual harassment sued the city, alleging, *inter alia,* a deprivation of her right to equal protection under the law. After finding that the plaintiff had established actionable sexual harassment and intent, the court addressed § 1983 liability. The Seventh Circuit held that the plaintiff had established that the fire department had a policy or custom because "sexual harassment [against female employees] was the general, on-going, and accepted practice at the East Chicago Fire Department, and that high-ranking, supervisory, and management officials responsible for working conditions at the department knew of, tolerated, and participated in the harassment." *Id.* at 1189. Here, although Hicks does not have the fact of a supervisor participating in the harassment, he has put forward evidence in the form of his affidavit testimony that harassment by Ms. Wilson against him on account of his sex was on-going and was an accepted practice by DOC. Hicks has put forward evidence that numerous supervisors, including relatively high-ranking officials, knew of the harassment and did nothing to stop it for at least one and a half years. Hicks also states that Assistant Director Barasch, in a phone conversation with Hicks, "acknowledged and admitted

---

[24] The express policy of DOC forbids behavior such as that Hicks complains of, and Hicks has not argued or put forward any evidence that any of his superiors to whom he complained were a "final policymaking authority." Thus, Hicks may prevail only under the second prong of the "*Monell* policy test."

37

that if such sexually abusive and offensive conduct . . . committed by Ms. Wilson against Hicks had been instead committed by Hicks (i.e. — a male) against a female that Cook County would have quickly acted and terminated [Hicks's] employment." (Pl. SAF ¶ 44.) The Court deems this fact admitted by Defendant because of a lack of support for its denial.[25] Hicks has also claimed (and the Court must accept his version of events) that he "suffered many instances of sexual harassment and often complained of them through official channels, but that nothing was done." *Bohen*, 799 F.2d at 1187. This evidence is sufficient to create a genuine issue of material fact as to whether DOC had an informal yet established custom or policy of discrimination against male victims of sexual harassment. *Id.* at 1187 ("[A] plaintiff can make an ultimate showing of sex discrimination . . . by showing that the conscious failure of the employer to protect the plaintiff from the abusive conditions created by fellow employees amounted to intentional discrimination."). Thus, Defendant's motion for summary judgment on Count IV is denied.

## IV.   Retaliation Claim (Count V)

In Count V, Hicks alleges that DOC retaliated against Hicks for having filed this lawsuit. Defendant argues that it is entitled to summary judgment on Hicks's retaliation claim because Hicks has not sustained any adverse employment action and because he has failed to prove retaliatory intent.

---

[25] Defendant cited to DOC's official sexual harassment policy and to Defendant's pleadings. A general denial based on these documents is insufficient record support to deny the specific allegation by Hicks that Barasch made these statements. Defendant also makes a general objection that this statement is "riddled with inadmissible hearsay" (Def. Resp. ¶ 44), but declines to elaborate. In the absence of a specific argument, such as that Barasch was making a statement concerning a matter outside the scope of his employment relationship with DOC, *see* Fed. R. Evid. 801(d)(2)(D), the Court will not sustain Defendant's objection.

A plaintiff may establish a *prima facie* case of retaliation through either the direct or indirect method of proof. "Under the direct method, the plaintiff must present direct evidence of (1) a statutorily protected activity; (2) an adverse action taken by the employer; and (3) a causal connection between the two." *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003). "Under the indirect method, the plaintiff must show that (1) [he] engaged in a statutorily protected activity; (2) [he] performed [his] job according to [his] employer's legitimate expectations; (3) despite [his] satisfactory job performance, [he] suffered an adverse action from the employer; and (4) [he] was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Id.* Both methods require a showing that the plaintiff suffered an adverse employment action.[26] *Williams v. Waste Mgt. of Ill.*, 361 F.3d 1021, 1031 (7th Cir. 2004).

Hicks alleges the following actions by DOC as retaliation for filing his federal lawsuit: (1) Sergeant Smith directing Hicks not to speak to Aramark employees about work-related concerns, delaying Hicks's ability to obtain items for one to two hours (Pl. SAF ¶ 52(a)); (2) Sergeant Page raising his voice at Hicks, such as the time Hicks was talked to about wearing inappropriate footwear (*id.*, ¶ 52(b)); (3) precluding Hicks from having access to a filing cabinet which contained supplies and forms that Hicks needed (*id.*, ¶ 52(c)); (4) repeatedly assigning Hicks to the East Dock (*id.*, ¶ 52(d)); (5) transferring Hicks from the Central Kitchen to Division

---

[26] Like the court in *Williams*, this Court notes that although retaliation claims need not always involve an adverse action regarding the plaintiff's employment, *see Herrnreiter v. Chicago Housing Auth.*, 315 F.3d 742, 745 (7th Cir. 2002), Hicks "has alleged only adverse action related to his employment in support of his retaliation claim, [so the Court will] evaluate his evidence in terms of whether it amounts to an adverse *employment* action." *Williams*, 361 F.3d at 1031 n.4 (emphasis in original).

10 for almost eight months (*id.*, ¶ 52(e)); (6) conducting an investigation into allegations of sexual harassment by Hicks (*id.*, ¶ 52(f)); (7) making Hicks submit to two drug tests (*id.*, ¶ 52(g)); (8) taking Hicks's gun from him temporarily (after learning that Hicks was undergoing psychiatric care) (*id.*, ¶ 52(h)); and (9) attempting to prevent Hicks from attending depositions (*id.*, ¶ 52(i)).

Most of the incidents proffered by Hicks do not come close to qualifying as an adverse job action. "At a minimum, the employee must be able to show a quantitative or qualitative change in the terms or conditions of employment." *Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 532 (7th Cir. 2003). In the retaliation context, the Seventh Circuit teaches that there are three basic categories of cases where courts have found the criteria for materially adverse employment actions to be met:

> (1) cases in which the employee's compensation, benefits or other financial terms of employment are diminished, including cases where employment is terminated; (2) cases in which a nominally lateral transfer without a change in financial terms significantly reduces the employee's career prospects by preventing him from using the skills in which he is trained and experienced; and (3) "[c]ases in which the employee is not moved to a different job or the skill requirements of his present job altered, but the *conditions* in which he works are changed in a way that subjects him to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment—an alteration that can fairly be characterized as objectively creating a hardship, the classic case being that of the employee whose desk is moved into a closet."

*Tart v. Ill. Power Co.*, 366 F.3d 461, 475 (7th Cir. 2004) (quoting *Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744-45 (7th Cir. 2002) (emphasis in original)). Hicks has provided no evidence that any of DOC's actions described above led to a change in his compensation, benefits, or other financial terms of employment. Nor has Hicks been terminated. Hicks's transfer from the Central Kitchen to Division 10 might possibly have qualified as an action of the

second category, but Hicks has not provided any evidence that the transfer reduced his career prospects, nor has he shown that his responsibilities there were "less significant than those of his prior position." *Tart*, 366 F.3d at 474. (Indeed, Hicks has not provided the Court with any evidence whatsoever as to what Division 10 is or what responsibilities he had there.) The more-frequent assignments to the East Dock could also perhaps be considered an action within this second category, but Hicks again does not provide the Court with any evidence that his reassignment reduced his job prospects or lessened his responsibility. Hicks merely points out that he did not like the isolation and that he had to call for a relief officer before he could use the restroom, the latter being an altogether reasonable limitation on a position that involves guarding a correctional facility. This reassignment (even had it been a permanent one, rather than merely an occasional daily assignment) is akin to the involuntary transfer in *Herrnreiter*, where the Court held that the plaintiff merely had a "purely subjective preference for one position over the other." *Herrnreiter*, 315 F.3d at 745. Based on the evidence presented by Hicks, the "two jobs were equivalent other than in idiosyncratic terms that do not justify trundling out the heavy artillery of federal antidiscrimination law." *Id.*

With the exception of his de-deputization, discussed *infra*, the rest of the actions described by Hicks would ostensibly fall into the latter category—an alteration of the conditions in which he worked. Actions in this category that consist of the kind of harassment alleged by Hicks must be "sufficiently severe to worsen substantially his conditions of employment as they would be perceived by a reasonable person in the position of the employee." *Herrnreiter*, 315 F.3d at 745. The actions of which Hicks complains may have been annoyances to him, but they simply do not rise to the level that a reasonable person would consider an adverse employment

action. *Compare Tart*, 366 F.3d at 475 (adverse employment action where employees transferred from desk job to digging trenches). Sergeant Page improperly yelling at Hicks for wearing the wrong type of work shoes (even assuming that Hicks was wearing proper shoes) is at most a "trivial personnel action" that cannot provide the basis for a lawsuit. *Hernnreiter*, 315 F.3d at 745. The same can be said of most of the other actions of which Hicks complains. Being denied access to a single filing cabinet does not significantly alter his working environment. DOC's alleged unsuccessful attempt to prevent Hicks from attending depositions did not change anything in his working environment, given that he was able to attend both the depositions and his rescheduled in-service training. Making Hicks take two drug tests as part of DOC's policy of random testing cannot be construed as "adverse" in any event. And Hicks has provided no evidence that DOC's investigation into alleged sexual harassment by him of female Aramark employees affected his ability to do his job.[27] (Indeed, the DOC would have been derelict if it did not investigate the multiple allegations that Hicks was a harasser.) In sum, these actions described by Hicks simply do not constitute the kind of "significantly negative alteration in his workplace environment" that would support a retaliation claim. *Herrnreiter*, 315 F.3d at 744.

The direction from DOC forbidding Hicks from bringing his complaints to Aramark employees and instead requiring him to speak to his DOC supervisor comes closer to the level of an adverse action, although it, too, is unlikely significant enough to constitute an objective "hardship" in his workplace. *Herrnreiter*, 315 F.3d at 745. Hicks alleges that the direction prevented him from obtaining the items he needed to complete his work for one to two hours.

---

[27] Hicks describes the investigation as "exhaustive" but does not provide any detail of how it affected him or his working environment. (*See* Pl. SAF ¶ 52(f).)

But Hicks admits that he was always able to get his work done (Def. SF ¶ 73), and he has

presented no evidence that he has been disciplined in any manner for an inability to do his work.

Ultimately, the Court finds that the inconvenience he suffered from having to wait to obtain

items from his DOC supervisor "may have been unpleasant, but it was not severe enough to

constitute an adverse employment action." *Haywood*, 323 F.3d at 532.

Hicks's strongest argument that an action by DOC after he filed his lawsuit may

constitute an adverse employment action is Hicks's de-deputization. As a result of DOC's

decision to de-deputize Hicks, he temporarily lost his right to carry a loaded weapon and his

credentials (*see* Pl. SAF ¶ 52(h)), surely a significant alteration in his condition of employment

and one that could reduce his future job prospects. But finding this one adverse employment

action is only the beginning. Hicks still must prove discriminatory animus under either the direct

or indirect method in order to survive summary judgment.

Hicks purports to present "extensive direct evidence" of DOC's retaliation. (D.E. 42 at

19.) He points to "[t]he timing of the DOC's suddenly particularly hostile actions against Hicks,

which started the month he filed his lawsuit (January 2003)." (*Id.*) Hicks also asserts that "the

retaliatory intent of the DOC's managerial employees for why they suddenly changed their

treatment of Hicks is easily discerned from their earlier repeated laughter when Hicks would

complain to them, as well as also their repeated attempts to dissuade and prevent Hicks from

pursuing his claims." (*Id.*) Although Hicks notes in his response that he may alternatively prove

his case by using the *McDonnell Douglas* burden-shifting framework, he does not attempt to put

forth evidence of the elements necessary to make out a case using that method. (*See id.* at 18-

19.) Thus, the Court will address the direct method.

Under the direct method of proof, a plaintiff may present either "*either* direct evidence *or* circumstantial evidence that would entitle a jury to conclude that the employer acted with forbidden animus." *Rogers v. City of Chicago*, 320 F.3d 748, 754 (7th Cir. 2003) (emphasis in original). Direct evidence is "an outright admission by the decisionmaker that the challenged action was undertaken [for retaliatory reasons]." *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 783 (7th Cir. 2004); *id.* at 786 (direct evidence is defined the same for discrimination and retaliation claims). Direct evidence such as the "I-am-not-promoting-you-because-you-are-a-woman type is understandably rare." *Volovsek v. Wisc. Dep't of Agric., Trade, and Consumer Prot.*, 344 F.3d 680, 689 (7th Cir. 2003). Hicks offers no direct evidence of retaliation—that is, he has "no evidence that a decisionmaker essentially admitted that he [or she] took the action against [Hicks] because [he] complained of discrimination." *Rogers*, 320 F.3d 748. Thus, the Court must decide whether the circumstantial evidence Hicks offers would allow a jury to infer intentional retaliation. *See Volovsek*, 344 F.3d 680; *Davis*, 368 F.3d at 786-87 (describing the "mosaic" of circumstantial evidence needed to prove intentional retaliation under the direct method of proof).

The Seventh Circuit teaches that circumstantial evidence of retaliatory intent usually comes in three varieties: "(1) suspicious timing, ambiguous statements, behavior towards other employees and so on; (2) evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently;" and (3) evidence that the employer's reason it gave for its difference in treatment constituting the adverse employment action is a pretext for discrimination. *Volovsek*, 344 F.3d at 689-90. This last category has been described as bearing an "eerie similarity to the evidence required under the indirect method." *Id.* at 690.

Hicks points to the timing of the actions of which he complains as evidence of retaliatory intent—all the events took place after he filed his lawsuit in January 2003. "There is no bright-line rule as to the amount of evidence necessary to survive summary judgment under the direct method, but it is clear that 'mere temporal proximity' is not enough to establish a genuine issue of material fact." *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004) (quoting *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002)). Indeed, Hicks does not even have the fact of suspicious timing for his one adverse employment action, his de-deputization. Hicks was de-deputized sometime in October 2003 (*id.* ¶ 52(h)), about nine months after he filed his lawsuit (or engaged in any other protected activity, such as filing his EEOC charge). Apart from the lengthy delay before de-deputizing Hicks, DOC offered a perfectly reasonable explanation for de-deputizing Hicks (that he was under the care of a psychiatrist). (Def. SF ¶ 83.) In addition, the Court finds compelling DOC's re-deputization of Hicks in a reasonable time after he saw a psychiatrist who deemed him competent, such that one could reasonably re-arm him with a deadly weapon. (*Id.*) In light of this record, nine months is far too long to allow a reasonable factfinder to infer that Hicks's de-deputization was causally related to, or retaliation for, the filing of Hicks's lawsuit. *Accord Haywood*, 323 F.3d 524 (one year too remote to infer causation); *Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 399 (7th Cir. 1999) (four-month delay was "counter-evidence" of causal inference); *Davidson v. Midelfort Clinic*, 133 F.3d 499, 511 (7th Cir. 1998) (no causal inference where employee was terminated five months after filing EEOC complaint). Similarly, if the Court assumes that the prohibition on speaking to Aramark employees constitutes an adverse employment action, the four-month time period between filing his lawsuit and Sergeant Page's direction to him does not create an

inference of retaliatory intent. Given that there is nothing facially dubious about ordering Hicks not to talk to Aramark employees who may be involved in a lawsuit he has filed, Hicks has failed to created a triable issue as to a causal link between his protected activity and any adverse employment action.[28]

Although Hicks does not argue that summary judgment is improper because he has made out a *prima facie* case of retaliation based on the indirect method of proof, and Hicks has thus arguably waived any such argument, it is worth noting that Hicks would not prevail under that theory based on the evidence in the record. Hicks cannot make out a *prima facie* case for either his de-deputization or DOC's prohibition on Hicks speaking to Aramark employees because Hicks has not pointed to any similarly situated employees who did not complain who were not subjected to these adverse employment actions (assuming they are such). *See Rogers*, 320 F.3d at 755. Hicks points to no similarly situated person regarding the de-deputization. To the extent that Hicks points to any comparators regarding the prohibition on speaking, he simply alleges that "[a]ll other correctional officers were allowed to speak with Aramark staff." (Pl. SAF ¶ 52(a).) This kind of blanket assertion does not help Hicks because, "even if it were true, [h]e does not cite to any evidence demonstrating that any of the other [correctional officers within the Central Kitchen] were directly comparable to [him] in all material respects." *Rogers*, 320 F.3d at 755 (holding that lack of comparators other than a broad assertion that no other officer was treated the same defeated a *prima facie* case of retaliation).

---

[28] The only other "evidence" of retaliatory intent offered by Hicks is the alleged laughter and dissuasion by DOC employees when he reported Ms. Wilson's actions. Hicks offers no reason other than his "pure speculation" that these actions (assuming they are true) are related in any way to the later events of which he complains. *Haywood*, 323 F.3d at 532.

In addition, even if Hicks were to make out a *prima facie* claim of retaliation based on his

de-deputization, DOC has offered a legitimate, non-discriminatory explanation (that DOC

learned he was undergoing psychiatric care, and therefore wanted to determine whether arming

him with a deadly weapon presented any unreasonable risks to prisoners, coworkers, or himself),

and Hicks has offered no evidence (or argument) that the explanation is a pretext for

discrimination. Unrebutted evidence of a "noninvidious reason for the adverse action" entitles a

defendant to summary judgment. *Stone*, 281 F.3d at 644; *accord Wyninger*, 361 F.3d at 981.

Similarly, it is obvious that telling a DOC employee who is involved in ongoing and escalating

conflicts with Aramark employees (which prompted expensive and time-consuming litigation for

the DOC) to stop interacting with those Aramark employees is a commonsense conflict-reducing

mechanism that likely should have been instituted far sooner. No reasonable jury would find this

evidence of unlawful intent; indeed, a jury would likely wish that the step had been instituted

years earlier. For all of these reasons, Defendant's motion for summary judgment is granted as to

Count V.

## CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is granted with respect to Counts III and V, and is denied with respect to Counts I, II, and IV.

So ordered.

_Mark Filip_
Mark Filip
United States District Judge
Northern District of Illinois

Date: _12-17-04_